**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>Donna Davey</u>

    **v.**                                      Case No. 05-cv-126-PB

<u>Life Insurance Co.</u>
<u>of North America</u>

<u>**MEMORANDUM AND ORDER**</u>

Donna Davey brings this claim for disability benefits
pursuant to the Employee Retirement Income Security Act of 1974
("ERISA"), as amended, 29 U.S.C. § 1132(a)(1)(B), to recover
benefits allegedly owed to her under the terms of her former
employer's long-term disability plan (the "LTD Plan").  The LTD
Plan is insured by defendant Life Insurance Company of North
America ("LINA").  Davey alleges that LINA's decision to
terminate her long-term disability benefits was unreasonable and
not supported by medical evidence.  Before me are the parties'
motions for judgment on the Administrative Record.  Because I
find that LINA's decision to deny Davey long-term disability
benefits was reasonable, I grant LINA's motion and deny Davey's
motion.

I.   **BACKGROUND**[1]

Donna Davey worked for CIGNA HealthCare of New Hampshire
("CIGNA") as a Quality Management Coordinator until June 4, 2001.
Admin. R. at 87.  As a regular employee, she was eligible to
participate in CIGNA's short-term disability ("STD") and long-
term disability ("LTD") plans.  Id. at 5.  At various times,
Davey suffered from fibromyalgia, osteoarthritis, irritable bowel
syndrome, depression, anxiety, post-traumatic stress disorder
("PTSD") and other ailments.  Pl.'s Mot. for J. on the Admin. R.
("Pl.'s Mot.") at 2-3.

A.   **The LTD Plan**

CIGNA sponsors a group insurance policy that provides LTD
benefits to eligible employees who are determined to be
"[d]isabled."  Admin. R. at 780.  The LTD Plan is administered by
CIGNA Group Insurance ("CGI") and insured by LINA, a CIGNA
company.[2]  Id. at 21, 777.  Eligibility for LTD benefits is
divided into two phases.  During the first phase of up to 18

---

[1]  The background facts are set forth in the parties' Joint
Statement of Material Facts (Doc. No. 14).  The parties did not
file a statement of disputed facts.  See LR 9.4(b).

[2]  LINA does not insure CIGNA's short-term disability plan.
Admin. R. at 21.

-2-

months, an employee is considered disabled if, "solely because of Injury or Sickness, he or she is unable to perform all the material duties of his or her Regular Occupation or a Qualified Alternative."  Id. at 780.  In the second phase, after collecting benefit payments for 18 continuous months, an employee is considered disabled only if he or she is "unable to perform all the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience."[3]  Id.

The LTD Plan expressly designates LINA as the "Plan fiduciary under federal law for the review of claims for benefits."  Id. at 794.  In that role, LINA has "the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact."  Id.

The LTD Plan specifies that long-term disability benefits will cease if LINA determines that the employee is no longer disabled.  Id. at 792.  In addition, if the disability is "caused

---

[3]  The two phases of disability under the LTD Plan are frequently referred to as the "own occupation" period (first 18 months) and the "any occupation" period (after 18 months).

by, or contributed to by," mental illness or certain other
enumerated conditions, there is a lifetime maximum of 24 monthly
disability payments.  <u>Id.</u> at 790.

**B.  <u>Davey's employment history</u>**

In 1994, Davey began working as an administrative assistant
for HealthSource New Hampshire, Inc., the predecessor to CIGNA
HealthCare of New Hampshire.[4]  Admin. R. at 90, 218.  In 1997,
Davey took the position of Quality Management Coordinator.  <u>Id.</u>
at 218.  Her job functions included providing administrative and
professional support to the Quality Management Program and
various committees, maintaining databases, collaborating on
National Committee for Quality Assurance ("NCQA") compliance
auditing, pulling data for various reports, and maintaining NCQA
compliance documentation.  <u>Id.</u> at 431.  This position required
her to spend approximately 4% of her time standing, 8% walking,
43% sitting, 2% lifting and 43% keying.  <u>Id.</u> at 92.

---

[4] Before working for HealthSource, Davey was employed as a
counselor (1990-93), travel coordinator (1989-90), tax examiner
(1989) and marketing coordinator (1983-86).  Admin. R. at 218.

C.  **Davey's medical history**[5]

Davey was first diagnosed with fibromyalgia[6] by her primary
care physician, Dr. Maria Davila, around September 1995.  Admin.
R. at 327.  A rheumatologist confirmed the diagnosis in March
1996.  Id. at 407.  Davey's fibromyalgia was treated with
medication and exercise.  Id. at 326-27, 407.  In July 1996,
Davey told her primary care physician that she was suffering from
fatigue and was seeing a counselor for depression.  Id. at 326.

Davey first saw Dr. Hoke Shirley, a rheumatologist, in March
1998.  Id. at 374.  Dr. Shirley thought Davey met the criteria
for fibromyalgia and recommended medication and exercise.  Id. at
375.  Davey continued to see Dr. Shirley regularly in 1998.  At
various times, Davey reported that she was doing poorly, had
stopped exercising, and was not taking recommended medications
because of their side effects.  Id. at 371-73.  She continued to
work full-time.  Id. at 372.

---

[5] The details of some of Davey's appointments have been
omitted because they do not impact the analysis of her claims.

[6] Fibromyalgia is "[a] syndrome of chronic pain of
musculoskeletal origin but uncertain cause."  Stedman's Medical
Dictionary 671 (27th ed. 2000).  Diagnostic criteria include
"pain on both sides of the body, both above and below the waist"
and "point tenderness in at least 11 of 18 specified sites."  Id.

In February 1999, Dr. Shirley noted that Davey continued to do poorly, though she was still working full-time.  Id. at 368. He thought she was doing worse "because of the current stressors in her job place and her depression surrounding it."  Id.  He recommended that she see a psychiatrist to address her problems with depression.  Id.  Around the same time, Davey told her primary care physician that she was having problems with her memory.  Id. at 321.

In March 1999, Dr. Shirley noted that Davey was having difficulty maintaining full-time work.  Id. at 366.  He recommended "a temporary leave of absence" from work so she could "get things under control" and incorporate an exercise program into her schedule.  Id.  By letter dated March 9, 1999, Dr. Shirley informed Davey's employer that she needed a "one month medical leave of absence . . . so that she can more completely attend to her musculoskeletal condition from a physical therapeutic and medical aspect."  Id. at 367.

Davey first saw Dr. Megan Carman, a psychiatrist, on March 25, 1999 for depression.  Id. at 312.  Dr. Carman noted that Davey was sleeping poorly, her energy was low and her concentration was poor.  Id.  Dr. Carman found her mood to be

-6-

"extremely anxious and dysphoric."  <u>Id.</u> at 313.  She recommended changes to Davey's medications and noted that Davey did "not appear capable of working due to her depression if not her fibromyalgia."  <u>Id.</u> at 314.

Davey saw Dr. Shirley again on April 6, 1999.  <u>Id.</u> at 365. She reported that changes in her medication had caused her to develop severe constipation, which had worsened her back and hip pain.  <u>Id.</u>  Dr. Shirley concluded that "[g]iven the degree of pain and fatigue and depression she has and the associated symptoms . . . [he] would extend her temporary disability for another two months."  <u>Id.</u>

On May 21, 1999, Davey saw Dr. Carman and reported that "she [did] not feel that she could perform her work duties in any manner whatsoever, as she is not even able to get things done around the house."  <u>Id.</u> at 310.  She also felt that "the depression [was] more disabling than the fibromyalgia."  <u>Id.</u>  Dr. Carman found Davey to be "quite depressed" and continued her "medical leave from work for another four weeks."  <u>Id.</u>  On June 4, 1999, Davey reported some improvement in her "energy level and motivation" and felt that her fibromyalgia was "under fairly good control."  <u>Id.</u> at 309.  Dr. Carman thought Davey's medications

-7-

may have been "causing some of her daytime sluggishness" and changed some of the dosages.  Id.  She also recommended continued individual therapy with Mark Ciocca, Ph.D.  Id.  Dr. Carman thought Davey did not "appear even ready to return to work part-time quite yet."  Id.

On June 15, 1999, Davey told Dr. Carman that she was feeling much better and felt that she could return to work part-time. Id. at 308.  Davey returned to work on July 5, 1999.  Id. at 91. Later that month, Dr. Shirley reported that Davey was "back at work full-time" and "appear[ed] to be doing pretty well."  Id. at 363.  He attributed this to her medications and exercise.  Id. He felt that although she could not perform her duties as well as she used to, she "could continue her job on a regular basis right now."  Id.

When Davey saw Dr. Shirley again in January 2000, he noted that Davey was "doing better" but had a "lack of mental acuity and some sleep problems."  Id. at 361.  She had also "fallen off [her] exercise program."  Id.

On January 28, 2000, Davey was involved in a motor vehicle accident and subsequently reported to her primary care physician that she was having headaches.  Id. at 318.  In June 2000, Davey

requested a referral to a neurologist because of ongoing
headaches.  Id.

In July 2000, Davey saw Drs. Shirley and Carman.  Id. at
360, 304.  She reported that she did not feel "quite as attentive
as she used to be," id. at 304, and "mentally [could] not keep up
with all the things she ha[d] to do at work," id. at 360.  Dr.
Carman thought Davey was having "some re-emergence of her
depressive symptoms, though certainly not as bad as when she
initially sought treatment."  Id. at 304.

Davey saw Dr. Daniel Botsford, a neurologist, on September
25, 2000.  Id. at 381.  She said her "problem with
distractibility and cognition" began seven years prior when she
"experienced a searing pain in her head and back followed by a
right body paresthesia that persisted over several hours."  Id.
An MRI taken at that time was deemed normal.  Id.  Dr. Botsford
recommended further testing and started her on Exelon
(rivastigmine).  Id. at 382.  The results of a subsequent
electroencephalography ("EEG") were "somewhat problematic to
interpret," though the "dominant portion of the record [was]
normal."  Id. at 378.

On September 29, 2000, Davey told Dr. Shirley that she had a
"lack of acuity of thought" and memory problems, though she was
still working full-time.  Id. at 359.  He noted that working was
"taking a toll on her" and that she was too fatigued from work to
comply with her exercise program.[7]  Id.

On November 2, 2000, Davey told Dr. Carman that her stress
at work was "extremely high" and her impaired concentration and
memory were "interfer[ing] with her work performance."  Id. at
302.  Dr. Carman discontinued Davey's Exelon prescription because
it was causing her "significant constipation" and recommended
that she begin taking Ritalin.  Id.

On January 4, 2001, Davey told Dr. Carman that she was not
doing well and had not filled the Ritalin prescription.  Id. at
301.  Davey reported that "her fibromyalgia [had] been quite
painful recently," she felt tired all of the time and was having
difficulty getting her work done.  Id.  She also reported that
she had gotten a poor review at work.  Id.  Dr. Carman noted that
Davey was "not doing very well but she [was] also not following
through on recommendations."  Id.  Dr. Carman substituted

---

[7] Davey did not see Dr. Shirley (or any other doctor) again
for her fibromyalgia until June 21, 2001.  Admin. R. at 338.

Provigil (modafinil) for Ritalin to help with Davey's "attention span and alertness."  Id.  She also suggested that Davey return to therapy and consider taking another medical leave from work if she did not improve.  Id.

On February 1, 2001, Davey told Dr. Carman that she had tried taking Provigil but it had caused "significant nausea and headaches."  Id. at 300.  Davey reported having difficulty getting her work done and was concerned about losing her job. Id.  In March 2001, Davey began seeing Susan L. Randlett, MSW for therapy and Eye Movement Desensitization and Reprocessing ("EMDR") treatment "to resolve past trauma issues related to her childhood and previous marriage."  Id. at 242.  Davey saw Randlett through August 2001.  Id. at 246-67.

On April 12, 2001, Davey told Dr. Carman that although work was still stressful, she had recently gotten "a much better review" and was applying for a raise.  Id. at 299.  She also reported that she was having a lot of pain from osteoarthritis and fibromyalgia and that she felt depressed if she missed a dose of her medication.  Id.  Dr. Carman thought Davey was "more overwhelmed by her physical problems than her emotional state"

-11-

and encouraged her to see Dr. Shirley regarding her pain level.
Id.

**D.  Short-term disability benefits claim**

Davey's last day of work at CIGNA was June 4, 2001.  Admin.
R. 83, 87.  On June 8, she saw Dr. Davila for problems with
constipation.  Id. at 316.  Dr. Davila referred Davey to a
gastroenterologist, who she saw on July 17, 2001.  Id. at 289.

On June 12, 2001, Davey saw Dr. Carman and reported that she
was "having a lot of problems with nausea and abdominal cramping
and constipation" and felt "lousy both physically and mentally."
Id. at 298.  Dr. Carman thought Davey needed "a medical leave of
absence [from] work" and recommended that she stay out of work
until July 1, 2001.  Id.

Davey submitted her claim for STD benefits on or around June
15, 2001.  Id. at 86.  She reported that she was unable to work
because of gastrointestinal ("GI") problems and depression.  Id.
at 84, 89.  Because her claim was based in part on depression, it
was referred to CIGNA Behavioral Health ("CBH"), the claims
administrator for behavioral health STD claims.  Id. at 24, 43,
93.

Dr. Carman submitted a Provider Functional Capabilities Statement ("PFCS") in June 2001 in support of Davey's claim for STD benefits.  Id. at 100.  She recommended that Davey remain out of work until July 1, 2001, and not return full-time until July 15, 2001.

On June 29, 2001, CBH approved Davey's STD benefits from June 5 until July 8, 2001.  Id. at 46.  Shortly thereafter, her benefits were extended to July 31, 2001.  Id. at 49.

In July 2001, Dr. Carman recommended that Davey begin a partial hospitalization program to address her increased depression.  Id. at 50, 252, 269.  On July 24, 2001, Randlett, Davey's therapist, wrote to Dr. Carman concerning Davey's failure to attend her therapy and partial hospitalization appointments the previous day.  Id. at 268.  Randlett noted that she had been completing Davey's disability reports and wondered if she was "enabling [Davey] to some degree."  Id.

Davey saw Dr. Carman again on July 26, 2001, and reported feeling anxious about an upcoming court appearance.  Id. at 296. Dr. Carman noted that Davey was "sabotaging her treatment in various ways" and was not ready to return to work.  Id.  Dr. Carman recommended extending Davey's medical leave until

-13-

September 1, 2001.  Id.  In a PFCS completed July 27, 2001, Dr.
Carman noted that Davey's PTSD had been aggravated.  Id. at 114.
CBH extended Davey's STD benefits to September 3, 2001.  Id. at
51.

On or about August 22, 2001, Davey was told that her
employer would not allow her to return to work on a part-time
basis and would start the process of replacing her if she did not
return full-time on September 4.  Id. at 56.  On August 28, Davey
told Dr. Carman that she was doing poorly and continued to have
"significant GI pain."  Id. at 294.  Dr. Carman noted that Davey
was "not ready to return to work" and thought they should "take
more aggressive measures with her medication."  Id.

On September 4, 2001, Davey's STD benefits were extended for
an additional two weeks and a doctor-to-doctor disability review
was scheduled with Dr. Carman.  Id. at 59.  On September 6, Davey
told CBH that her symptoms had not improved and her doctor wanted
her to remain out of work until mid-October.  Id. at 60.

On September 14, 2001, Dr. John Luehr, a CBH medical
consultant, discussed Davey's case with Dr. Carman.  Id. at 61.
Dr. Carman reported that she thought Davey's primary disability
was psychiatric and her "current somatic complaints are more

-14-

stomach/GI than fibromyalgia." <u>Id.</u>  Dr. Luehr concluded that Davey met the criteria for ongoing STD benefits and could not return to work for another four to six weeks.  <u>Id.</u>  Davey's STD benefits were extended to October 14, 2001.  <u>Id.</u>

Davey saw Dr. Carman again on September 28 and October 12, 2001.  <u>Id.</u> at 292, 293.  Dr. Carman noted that Davey was still depressed and did not feel capable of returning to work on a full-time basis.  <u>Id.</u> at 293.  In her October 12, 2001 PFCS, Dr. Carman estimated that Davey would be able to return to work on November 15, 2001.

CBH extended Davey's STD benefits on October 25, 2001, after her case was discussed at a panel review with Dr. William Hague. <u>Id.</u> at 65.  CBH then scheduled a doctor-to-doctor review with Dr. Ciocca, who was seeing Davey for individual therapy, after Dr. Carman failed to respond to CBH's requests for a review.  <u>Id.</u>

On October 30, 2001, Dr. Murphy informed Davey's primary care physician that "the majority of [Davey's] GI symptoms ha[d] abated" after changes were made to her anti-inflammatory medications.  <u>Id.</u> at 376.

On November 1, 2001, CBH consultant Kathleen Papatola, Ph.D., discussed Davey's case with Dr. Ciocca.  <u>Id.</u> at 66.

According to Dr. Papatola, Dr. Ciocca thought that Davey's level
of impairment was due more to medical issues than mental illness.
Id.  He also allegedly reported that she was not "100%
psychiatrically disabled" and could go back to work part-time.
Id.  Dr. Ciocca later disputed Dr. Papatola's characterization of
his statements.  Id. at 207-08.

Following a November 1, 2001 panel review, CBH determined
that Davey no longer met the criteria for behavioral health
disability benefits because her inability to work full-time was
due to medical issues and not mental health issues.  Id. at 66.
By letter dated November 1, 2001, CBH informed Davey that she was
no longer "totally disabled from performing [her] job due to a
psychiatric disability."  Id. at 162.  Davey was also told that
she could appeal this determination and she could file a
"medical" STD claim with CIGNA Disability Management Solutions
("DMS").  Id. at 67.

Davey appealed the termination of her STD benefits on
November 20, 2001.  Id. at 173.  Davey stated that she had been
experiencing "a recurrence of a Major Depressive Disorder since
May of 2001" and she believed her symptoms rendered her disabled.
Id.  CBH upheld its denial following another panel review with

-16-

Dr. Hague and other CBH staff.  Id. at 70.  In a letter dated December 4, 2001, CBH informed Davey of its denial of her appeal and her right to pursue a second-level appeal.  Id. at 174.

Davey filed a second appeal of the termination of her STD benefits on December 20, 2001.  Id. at 175.  Davey stated that she had "suffered from Fibromyalgia for several years" and was experiencing "both increased and additional symptoms," including "clinical depression."  Id.  She contended that she was eligible for both STD and LTD benefits due to her medical and psychiatric symptoms, whether considered separately or combined.  Id.

On or about January 10, 2002, Dr. Ciocca submitted an affidavit to CBH in which he disputed Dr. Papatola's account of their November 1, 2001 doctor-to-doctor review.  Id. at 207-08.  Dr. Ciocca stated that Davey was "significantly impaired" on November 1, 2001, "owing to symptoms of Major Depression, Posttraumatic Stress Disorder, and Fibromyalgia."  Id. at 207.  He also stated that he "did not clear [Davey] for return to work."  Id. at 208.  Based on Dr. Ciocca's affidavit and his subsequent conversation with Dr. Hague on January 22, CBH overturned its denial of Davey's STD benefits.  Id. at 78-79.  Accordingly, Davey was paid STD benefits for the period between

-17-

November 1, 2001 and December 5, 2001 (the start date for LTD

benefits).  <u>Id.</u> at 79.

**E. <u>Long-term disability benefits claim</u>**

On October 29, 2001, Lynette Gibson sent Davey a letter

advising her that CIGNA Group Insurance ("CGI") had begun its

evaluation of her LTD claim.[8]  Admin. R. at 157.  Davey was asked

to provide certain information in support of her claim by

November 9, 2001.  <u>Id.</u>

On November 6, 2001, CGI sent Davey a letter informing her

that because her STD benefits were terminated effective November

1, she had not satisfied the waiting period for LTD benefits.

<u>Id.</u> at 172-72A.  On January 3, 2002, Davey's attorney appealed

the denial of Davey's claim for LTD benefits, "pending an appeal

of [Davey's] STD denial."  <u>Id.</u> at 191.  After CGH overturned the

denial of her STD benefits on January 22, 2002, Davey returned

CGI's disability questionnaire and submitted medical records[9] to

support her LTD benefits claim.  <u>Id.</u> at 214.

_____

[8] As noted above, CGI administered the LTD Plan, which was
insured by LINA.

[9] The records included office notes of Drs. Shirley, Carman,
Ciocca, Davila, Botsford and Murphy.  Admin. R. at 225-408.

-18-

By letter dated February 25, 2002, CGI informed Davey that her LTD claim was being reviewed.  Id. at 418.  On March 7, 2002, Edward Zevola, RN, who was reviewing Davey's LTD claim, discussed her case with Dr. Ciocca.  Id. at 443.  Dr. Ciocca indicated that Davey was not doing well and could only perform "two hours of sustained activity before needing a significant rest period." Id.  Dr. Ciocca estimated that Davey would not be able to return to work for at least three months "due to ongoing treatment and medication adjustments."  Id.

In March 2002, Dr. Shirley completed a "current work status" form in which he indicated that Davey could "barely" perform part-time work.  Id. at 450-51.  He also indicated that she could sit for three hours per day, but only for one hour at a time. Id. at 451.  Dr. Carman also completed an Assessment of Psychiatric Function form on which she indicated that Davey would not be able to work full-time "in [the] next 2 years if ever" due to "[t]reatment resistant depression complicated by chronic physical problems."  Id. at 467-68.

On March 18, 2002, Zevola summarized his review of Davey's LTD claim as follows: "[Davey] has been diagnosed with major depression and fibromyalgia.  Her symptoms are consistent with

-19-

both diagnoses. . . . It appears that [Davey's] primary diagnosis
is depression although all providers have [provided]
restrictions.  Based on the medical documentation, it appears
that the occupational restrictions are supported by the medical
documentation."  Id. at 168-69, 473.  Based on Zevola's review,
Davey's LTD claim was approved on March 25, 2002.  Id. at 169.
CGI sent Davey a letter informing her that her LTD benefits had
been approved, subject to the LTD Plan's mental illness
limitation of 24 monthly payments.  Id. at 476-77.

Davey saw Dr. Shirley on April 26, 2002, and reported that
she continued to suffer from "fogginess of thought" and "intense
fatigue."  Id. at 524.  Dr. Shirly noted that Davey had shown
"very limited improvement, if any, on a very comprehensive
multidisciplinary program for management of her soft tissue
pain."  Id.  On the same day, he completed an Attending
Physician's Statement of Disability in which he reported that
Davey's maximum level of physical ability was "sedentary at most"
and she would "never" be able to go back to work.  Id. at 491-92.

By letter dated January 6, 2003, CGI informed Davey that her
LTD claim was being reviewed because she was approaching the "18
month point," at which time she would be considered disabled only

if she was unable to perform the essential duties of any
occupation for which she was reasonably qualified.  Id. at 508.
The letter also stated that Davey would only be eligible for
benefits through December 4, 2003, because of the 24-month mental
illness limitation.  Id. at 509.  Davey was asked to complete a
Disability Questionnaire, see id. at 525-28, and CGI requested
updated records from Dr. Carman and Dr. Shirley.  Id. at 510,
513.

        In response, Dr. Carman submitted office notes from her
appointments with Davey on May 3, July 2, and October 3, 2002.
 Id. at 515-20.  She also noted that Davey's depression was in
"partial remission" and her activities were "[p]rimarily limited
by physical pain and easy fatiguability [and] not by depression
at this point."  Id. at 516-17.  Dr. Shirley submitted office
notes for his appointments with Davey on April 26 and October 23,
2002.  Id. at 521-24.  He reported that Davey had diffuse pain
that was always present as well as fatigue and sleep
disturbances.  Id. at 521.  In response to the question, "What
prevents him or her from performing, on a full-time basis,"
"sedentary work," "light work" and "medium work," Dr. Shirley
crossed out "light work" and "medium work" and wrote "fatigue,

-21-

diffuse pain." Id. at 522.

Davey saw Dr. Carman on January 23, 2003 and reported that "her pain [had] been fairly significant over the last three months." Id. at 585.  Dr. Carman noted that Davey had osteoarthritis in addition to fibromyalgia.  Id.  Dr. Carman reported that Davey's "mood clearly hinges on how she is doing physically.  It does not appear to be a failure of her psychotropics at this point." Id.  She did not make any changes to Davey's medications.  Id.

On March 24, 2003, Davey saw Dr. Shirley because she was "having a lot of increased pain in the left lateral hip girdle region." Id. at 624.  She also "complain[ed] vehemently about a lack of acuity of thought." Id.  Dr. Shirley gave her an injection in the "left trochanteric bursa" to address the hip pain.  Id.  Davey saw Dr. Shirley again on April 21, 2003, and said she felt about the same.  Id. at 623.  She reported having a lot of fatigue and difficulty concentrating.  Id.

On April 24, 2003, Davey's LTD claim was reviewed by Dr. Neilson, a consulting physician for CGI.  Id. at 169.  Dr. Neilson thought that Davey's cognitive symptoms were related to depression and not the "fog" that can result from fibromyalgia.

-22-

<u>Id.</u>  He recommended that Davey undergo a functional capacity evaluation ("FCE") to determine if she could perform a sedentary occupation.  <u>Id.</u>

The same day, Davey saw Dr. Carman and reported being "very stressed" because her LTD benefits would be ending in June or December and she would also lose her medical insurance at that time.  <u>Id.</u> at 726.  Dr. Carman noted that Davey was "still clearly unable to return to work due to both her physical and psychiatric illnesses."  <u>Id.</u>

On June 6, 2003, Davey underwent an FCE at HealthSouth Sports Medicine and Rehabilitation ("HealthSouth").  <u>Id.</u> at 550. Davey was not able to complete some of the FCE tests due to fatigue and pain.  <u>Id.</u> at 555.  The report concluded that Davey was functioning "below the sedentary physical demand category for an 8 hour work day with a maximum lift of 6 lbs., frequent positional changes from standing to walking, and constant sitting."  <u>Id.</u> at 554.  The report also noted that a "higher capacity may have been possible due to self limiting behavior, minimal musculoskeletal changes, and inconsistencies with isometric testing."  <u>Id.</u>  Under "physical demand category", the "Sedentary Work" box was checked.  <u>Id.</u>

-23-

On June 17, 2003, Dr. Carman submitted additional medical records to CGI, including notes from Davey's office visits in 2002 and 2003.  Id. at 581.

On June 20, 2003, CGI asked Dr. Shirley to clarify whether he thought that Davey could perform sedentary work and to comment on the FCE.  Id. at 597.  Dr. Shirley responded that he did not think Davey had "a physical work capacity at any capacity level at a part or full time basis."  Id. at 603.  On July 18, 2003, CGI requested that Dr. Shirley provide "any objective medical information available regarding your treatment of [Davey] that you feel refutes the functional capacity testing completed and supports your statement that she cannot maintain sedentary activity for more than an hour or so."  Id. at 607.  After seeing Davey on July 21, 2003, see id. at 621, Dr. Shirley responded that the FCE was consistent with his "feeling clinically that [Davey] does not have a full-time capacity for work in any physical capacity currently."  Id. at 776.  He interpreted the FCE to mean that "even though [Davey] might have a sedentary work capacity at times, she clearly cannot function on a full-time basis."  Id.  In August 2003, CGI requested additional medical records and Dr. Shirley submitted notes from Davey's October 23,

-24-

2002 through July 21, 2003 office visits.  Id. at 620.

On August 22, 2003, Davey spoke with Lynette Gibson at CGI and told her that she was going back to her psychiatrist in order to "prove [her] disability."  Id. at 626.

By letter dated September 4, 2003, CGI informed Davey that she was no longer disabled under the terms of the LTD Plan.  Id. at 627–29.  Davey was paid LTD benefits through October 4, 2003. Id. at 675.

**F.  Davey's appeal**

Davey saw Drs. Carman and Shirley in October 2003 and asked them to write letters in support of her LTD claim.  Admin. R. at 653, 725.  Dr. Carman noted that Davey "appear[ed] to be having a relapse of her depression" due in part from increased stress. Id. at 725.  Both doctors concluded that Davey was unable to work in any capacity.  Id. at 653, 725.  Dr. Shirley also sent a letter to CGI on October 29, 2003, contending that he had provided medical documentation of Davey's fibromyalgia and her inability to work at a sedentary capacity.  Id. at 637–38.

By letter dated December 12, 2003, Davey appealed the termination of her LTD benefits.  Id. at 650–51.  In support of her appeal, Davey submitted a letter from Dr. Carman dated

October 28, 2003, and office notes from Davey's appointments with Dr. Shirley through October 29, 2003.  Id. at 652-59.

On December 18, 2003, Davey saw Dr. Carman, who planned to leave her practice in February 2004.[10]  Id. at 724.  Dr. Carman reported that Davey remained "disabled by a combination of her fibromyalgia and depression."  Id.

CGI acknowledged receipt of Davey's appeal on January 12, 2004 and gave Davey the opportunity to submit additional information in support of her appeal.  Id. at 673-74.  On February 20, 2004, Davey's attorney submitted an October 27, 2003 letter from Davey in which she contested the termination of her LTD benefits.  Id. at 679-82.

CGI then referred Davey's claim to two independent examiners for peer reviews.  Id. at 684-88.  On or about March 17, 2004, CGI received a peer review report from Dr. Barry Kern, who is board-certified in occupational medicine.  Id. at 690-96.  To prepare his report, Dr. Kern reviewed Davey's medical records and

---

[10] Davey's psychiatric care was transferred to Dr. Joseph Sack, who worked in the same practice.  Admin. R. at 724.  Dr. Sack began seeing Davey in February 2004 but did not want to be involved in her LTD appeal.  Id. at 722-23.

spoke with Dr. Shirley on March 8, 2004.  Id. at 694.  Dr. Kern

concluded:

> [Davey's] diagnosis is fibromyalgia.  She has had this
> for at least 8 years.  Her symptoms are pain in her
> joints and fogginess of thinking. . . . The treating
> doctor and the patient have stated that her symptoms
> have worsened but there are no clinical objective
> findings to support this.  She states she has fogginess
> of thinking but there have been no objective measures
> to verify this symptom. . . .
>
>      . . . .
>
>      The medical documentation does not support
> [Davey's] inability to work full time at a sedentary
> position during the time period of October 4, 2003
> through present.  The patient has had the diagnosis of
> fibromyalgia for at least 8 years and worked at least
> five of those years after the diagnosis.  She reported
> stressors at work and this was the reason that her
> psychiatrist initially took her off of work.  She did
> not even go to her treating rheumatologist to determine
> if her fibromyalgia was significant enough to preclude
> work. . . .  Discussion with the treating
> rheumatologist indicates that he feels that the patient
> cannot do any meaningful work, even sedentary work.
> This is based entirely on his clinical judgment.  In my
> opinion, the objective findings in the available
> medical records do not support this degree of
> limitation.  There is no documentation presented that
> would indicate [Davey] would be limited from performing
> her regular fulltime [sic] work activities at this
> time.  There was no change in her clinical objective
> findings prior to the time she went out of work
> compared to the time after she went out of work.  The
> treating physician's decision regarding functional
> impairment appears to be based on subjective complaints
> and her failure to improve on her medical regimen.

<u>Id.</u> at 695.

On or about March 22, 2004, CGI received a second report from I. Jack Abramson, M.D., a board-certified psychiatrist.  <u>Id.</u> at 697-700.  Dr. Abramson reviewed the available medical records, including Dr. Carman's October 28, 2003 letter.  <u>Id.</u> at 698.  He also spoke with Dr. Shirley and attempted to contact Dr. Carman at her former office.[11]   <u>Id.</u> at 699.  Dr. Abramson was asked to comment on Davey's ability to function on a continuing basis since October 4, 2003, and he found the medical documentation to be "significantly lacking" in that regard.  <u>Id.</u>  Dr. Abramson concluded:  "In terms of [Davey's] psychiatric symptoms, the documentation and clinical information provided is inadequate to support her inability to function in a work setting on a continuous basis since October 4, 2003."  <u>Id.</u>

On April 7, 2004, CGI informed Davey that it was affirming the termination of her LTD benefits based in part on the reports of Drs. Kern and Abramson.  <u>Id.</u> at 707-08.

---

[11] Dr. Sack, who started seeing Davey after Dr. Carman left the practice, was unwilling to comment on issues related to Davey's LTD claim.  Admin. R. at 699.

On May 6, 2004, Davey's attorney submitted an April 21, 2004 letter from Dr. Shirley in which he disagreed with Dr. Kern's report.  Id. at 712-14.  CGI responded that Dr. Shirley's letter was not supported by medical records and was not sufficient for a "voluntary appeal."  Id. at 715.  On June 29, 2004, Davey's attorney submitted copies of Dr. Carman's office notes between 1999 and 2003, as well as Dr. Joseph Sack's office notes from February and April 2004.  Id. at 719-56.  Davey's attorney also indicated that he was trying to obtain an updated report from Dr. Carman.  Id. at 719-20.

On July 19, 2004, CGI informed Davey that it was accepting her voluntary appeal.  Id. at 757-60.  Davey was given the opportunity to submit additional information to support her LTD claim.  Id. at 757-58.  On August 12, 2004, Davey's attorney reported that he was still waiting for a report from Dr. Carman, which he had requested three times.  Id. at 762.

On October 6, 2004, CGI informed Davey that the additional information submitted by her attorney had been reviewed and the decision to deny her further LTD benefits had been upheld.  Id. at 767-69.  Davey's claim had been reviewed by CGI's Associate Medical Directors, who concluded that the medical information on

-29-

appeal was "not compelling to support an impairment to preclude [Davey] from performing her occupation." <u>Id.</u> at 768.  The letter also noted that although Davey "had complaints of fibromyalgia and depression," CGI had "not been provided with medical information that supports a severity in her conditions which would preclude [Davey] from performing a sedentary occupation." <u>Id.</u> at 769.  CGI also informed Davey that she had exhausted all administrative levels of appeal.  <u>Id.</u>  On October 28, 2004, Davey's attorney wrote to the Appeals Claim Examiner at CGI and enclosed a copy of Dr. Shirley's July 21, 2003 letter.  <u>Id.</u> at 774.  He also indicated that he was still waiting for a report from Dr. Carman.  <u>Id.</u>

This action followed.


## II.  <u>STANDARD OF REVIEW</u>

When a denial of benefits is challenged under ERISA, § 1132(a)(1)(B), and the "plan administrator has discretion to determine an applicant's eligibility for and entitlement to benefits, the administrator's decision must be upheld unless it is 'arbitrary, capricious, or an abuse of discretion.'" <u>Gannon v.</u>

Metro. Life Ins. Co., 360 F.3d 211, 212-13 (1st Cir. 2004)

(quoting Vlass v. Raytheon Employees Disability Trust, 244 F.3d

27, 29-30 (2001)); see Firestone Tire & Rubber Co. v. Bruch, 489

U.S. 101, 115 (1989).  This standard means that "the

administrator's decision must be upheld if it is reasoned and

supported by substantial evidence" in the record.  Gannon, 360

F.3d at 213.  Substantial evidence means evidence that is

"reasonably sufficient to support a conclusion," and "the

existence of contradictory evidence does not, in itself, make the

administrator's decision arbitrary."  Vlass, 244 F.3d at 30.

Finally, in reviewing a decision to terminate benefits, "a court

is not to substitute its judgment for that of the decision-

maker."  Terry v. Bayer Corp., 145 F.3d 28, 40 (1st Cir. 1998)

(quotation and brackets omitted).


### III.  **ANALYSIS**

Davey challenges both the decision to terminate her LTD

benefits and the procedure LINA followed to reach that decision.

Specifically, Davey argues that (1) there is no medical evidence

in the record to support the determination that she can work in a

sedentary capacity; (2) LINA inappropriately relied upon the

opinion of its consulting physicians and failed to submit all of Davey's medical records to its medical advisor; and (3) the LTD Plan's 24-month mental illness limitation should not be applied to her claim.[12]  I address each of her arguments in turn.

## A.  <u>Medical evidence</u>

First, Davey contends that the medical evidence does not support LINA's determination that she was capable of doing sedentary work in September 2003, when her LTD benefits were terminated.  A careful review of the record reveals conflicting evidence in this regard.  In order to qualify for continued LTD benefits, Davey had to be "unable to perform all the material duties of any occupation" for which she was qualified.  Admin. R. at 780.  Dr. Carman and Dr. Shirley were asked to provide updated medical records in January 2003 to assist CGI in determining

---

[12] Davey also claims that the initial decision to terminate her STD benefits was made in bad faith so that she could not qualify for LTD benefits.  Pl.'s Mot. at 16.  However, LINA did not administer or insure Davey's STD benefits and therefore is not the proper defendant against which to bring this claim. Furthermore, CBH ultimately paid Davey's STD benefits in full and therefore she cannot state a claim under ERISA § 502(a)(1), 29 U.S.C. § 1132(a)(1).  To the extent that Davey seeks compensatory or punitive damages based on her allegations of "bad faith," <u>see</u> Am. Compl. at 6, such extracontractual damages are not recoverable under ERISA.  <u>See</u> <u>Drinkwater v. Metro. Life Ins. Co.</u>, 846 F.2d 821, 825 (1st Cir. 1988).

whether Davey met this criteria.  Id. at 510, 513.  Dr. Carman
responded that Davey's depression was in "partial remission" and
that she was limited primarily by physical pain.  Id. at 517.
Dr. Shirley responded that Davey suffered from diffuse pain,
fatigue and sleep disturbances.  Id. at 521.  His report
indicated that Davey could not perform "light" or "medium" work,
but was unclear as to whether she could perform sedentary work.
Id. at 522.

Davey underwent an FCE on June 6, 2003, to evaluate her
capacity to perform sedentary work.  Id. at 554.  The FCE report
noted that Davey "complained of low back pain with the maximum
floor to knuckle lift" and "complained of shoulder and neck pain
with the maximum knuckle to shoulder and shoulder to overhead
lifting."  Id. at 555.  Other tests were not completed at Davey's
request.  Id.  Although the report concluded that Davey was
functioning below the "sedentary physical demand category," it
also noted that a "higher capacity may have been possible due to
self limiting behavior . . . and inconsistencies with isometric
testing."  Id. at 554.  The "Sedentary Work" box under "physical
demand category" was also marked.  Id.

CGI then asked Dr. Shirley to comment on the FCE and Davey's ability to perform sedentary work.  Id. at 597.  On July 21, 2003, Dr. Shirley responded that the FCE was consistent with his clinical "feeling" that Davey did not have the physical capacity to work.  Id. at 776.  He interpreted the FCE to mean that "even though [Davey] might have a sedentary work capacity at times, she clearly cannot function on a full-time basis."  Id.  In August 2003, Dr. Shirley submitted office notes from Davey's most recent visits at CGI's request.  Id. at 620.

After Davey appealed the termination of her LTD benefits, her claim was reviewed by two independent consultants, Drs. Kern and Abramson.  Id. at 691, 698.  Both examiners reviewed Davey's medical records and spoke with Dr. Shirley.  Id. at 694, 699.  Dr. Shirley told Dr. Kern that he did not think Davey could do sedentary work.  Id. at 695.  Dr. Kern thought that "the objective findings in the available medical records [did] not support this degree of limitation" and that Dr. Shirley was basing his conclusions on Davey's "subjective complaints" and "failure to improve on her medical regimen."  Id.  Dr. Abramson thought the "documentation and clinical information" were

"inadequate" to support a finding that Davey was unable to work.
Id. at 699.

Davey submitted additional medical records in June 2004 as
part of her voluntary appeal.  Id. at 719-56.  CGI's Associate
Medical Directors reviewed Davey's medical records and concluded
that they were "not compelling to support an impairment" that
would preclude Davey from performing a sedentary occupation.  Id.
at 768.

Viewing the record as a whole, there is substantial evidence
to support LINA's determination that Davey could perform
sedentary work in September 2003.  In January 2003, Dr. Carman
reported that Davey was primarily limited by physical pain and
not depression.  Id. at 517.  CGI then requested the FCE to
determine Davey's physical capacity to work.  Although the
results were somewhat equivocal, as LINA acknowledges, the
reliability of the test was limited by Davey's failure to perform
all of the required tasks.  CGI also relied upon the opinion of
its medical consultants, who reviewed Davey's medical records and
spoke with her treating physicians.  The consultants found
inadequate support for Dr. Shirley's opinion that Davey did not

have the capacity to work in a sedentary position.  Accordingly, I conclude that LINA's decision to terminate Davey's LTD benefits was reasonable and entitled to deference.  See Gannon, 360 F.3d at 213.

## B.  **Procedure**

Next, Davey argues that LINA improperly relied upon the opinions of its consultants over the recommendations of her treating physicians.  Although plan administrators may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," they are not required to "accord special weight to the opinions of a claimant's physician."  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).  Here, LINA did not arbitrarily discredit Dr. Shirley's opinion but rather concluded that his conclusions were not adequately supported by objective medical evidence.  See Admin. R. at 628-29, 707.  The fact that Dr. Shirley did not agree with the opinions of LINA's medical consultants does not render LINA's decision arbitrary or capricious.  See Gannon, 360 F.3d at 216 ("[I]n the presence of conflicting evidence, it is entirely appropriate for a reviewing

court to uphold the decision of the entity entitled to exercise its discretion.").

Davey also contends that LINA's procedure was flawed because it failed to provide all of her medical records to its "psychiatric medical advisor."[13]  Pl.'s Mot. at 18.  Davey's claim apparently arises from Dr. Abramson's comment in his March 2004 report that there was "no psychiatric documentation beyond a letter from Dr. Carman dated October 28, 2003."  Admin. R. at 699.  Davey submitted additional records from her office visits with Drs. Carman and Sack, which were reviewed by CGI's Psychiatric Associate Medical Director as part of Davey's voluntary appeal.  Id. at 767–69.  Davey apparently contends that LINA should have provided the additional records to Dr. Abramson for a second review instead of having a different consultant review the records.  This argument is without merit because ERISA does not require the plan administrator to consult the same medical advisor at different levels of appeal; indeed, the regulations suggest that deference should not be given to a prior

---

[13] It is not clear whether Davey is referring to Dr. Abramson or the Psychiatric Associate Medical Director who reviewed Davey's voluntary appeal.  See Admin. R. at 768.

adverse benefit determination.  <u>See</u> 29 C.F.R. § 2560.503-
1(h)(3)(ii).

**C.   <u>Mental illness limitation</u>**

Finally, Davey argues that LINA should be "estopped" from
applying the LTD Plan's 24-month mental illness limitation to her
claim and that this provision violates the Americans with
Disabilities Act, 43 U.S.C. § 1201 et seq.  Davey's LTD benefits
claim was initially approved subject to the 24-month mental
illness limitation because her primary diagnosis was depression.
Admin. R. at 476-77.  However, Davey only received LTD benefits
for 22 months and the termination of her benefits was not based
on the mental illness provision.  <u>See</u> <u>id.</u> at 627-29.  Rather, as
discussed above, Davey's benefits were terminated because LINA
determined that she was no longer disabled under the terms of the
LTD Plan.  <u>Id.</u> at 629.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, I grant LINA's motion for
judgment on the administrative record (Doc. No. 16) and deny
Davey's motion (Doc. No. 15).  The clerk shall enter judgment
accordingly.

SO ORDERED.

                                        /s/Paul Barbadoro
                                        Paul Barbadoro
                                        United States District Judge

June 14, 2006

cc:  Bradley M. Lown, Esq.
     William D. Pandolph, Esq.